LAURA TAYLOR SWAIN, United States District Judge
Plaintiff Jan Harris brings this action for trespass and an accounting against Defendants TD Ameritrade Inc., TD Ameritrade Clearing, Inc., Scottrade Inc. (collectively, the "Brokerage Defendants") and Defendants Depository Trust and Clearing Corporation, Depository Trust Company, and Cede & Co. (collectively, the "DTC Defendants"). The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332. On November 14, 2017, TD Ameritrade Inc., TD Ameritrade Clearing, Inc., and Scottrade filed motions to dismiss to dismiss the Complaint (docket entry no. 1, Compl.) or, in the alternative, to compel arbitration. (Docket entry nos. 23, 31.) That same day, the DTC Defendants also filed a motion to dismiss the Complaint. (Docket entry no. 27.) On August 15, 2018, Magistrate Judge Moses issued a Report and Recommendation proposing that the Brokerage Defendants' motions to compel arbitration and the DTC Defendants' motion to dismiss be granted, and that the case be stayed as against the Brokerage Defendants and dismissed with prejudice as against the DTC Defendants. (Docket entry no. 59, the "Report.") Harris filed an Objection to the Report on August 30, 2018. (Docket entry no. 61, the "Objection.") Defendants filed their responses to the Objection, without making any objections of their own. (Docket entry nos. 63, 64, 65.) The Court has reviewed thoroughly all of these submissions.
When reviewing a Report and Recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C) (LexisNexis 2017). The Court must make a de novo determination *174 to the extent that a party makes specific objections to a magistrate's findings. United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997). To the extent, however, that the party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report strictly for clear error. Pearson-Fraser v. Bell Atl., 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003).
Harris objects primarily to the Report's failure to consider Harris' "claim to be a shareholder of record," which Harris contends is a "viable federal claim protected by the Due Process Clause of the Fifth Amendment," and "based on her liberty and property interests found in 17 C.F.R. § 240.15c3-3" ("SEC Rule 15c3-3"). (Objection at 4-5.) Harris argues that this Court should not adopt the Report and its recommended conclusion because the Report does not "correctly identify[ ] the source and nature of the property and liberty interests Harris seeks to vindicate." (Id. at 5.) To the extent that this objection raises an argument that was previously raised in opposition to Defendants' motions to compel arbitration and dismiss the Complaint, the Court finds that there is no clear error in Judge Moses' conclusion that both of Harris' claims in this action are premised on state law causes of action. The Complaint does not on its face present a constitutional due process claim, nor does it invoke SEC Rule 15c3-3. To the extent that this objection raises a new legal argument for the first time, the Court finds that Harris has not presented a "compelling justification for failure to present such [arguments] to the magistrate judge" and the Court declines to consider it at this stage. See Berbick v. Precinct 42, 977 F.Supp.2d 268, 274 (S.D.N.Y. 2013). The Court notes that, even if it were to consider Harris' constitutional due process argument, that argument would be unpersuasive for substantially the reasons identified by the DTC Defendants in their response to Harris' Objection. (See docket entry no. 65 at 6-9.)
Harris next objects to the Report's conclusion that arbitration with the Brokerage Defendants should be compelled. Specifically, Harris argues that her constitutional due process claim is outside the scope of her arbitration agreements with the Brokerage Defendants, and that FINRA's dismissal of previous claims against the Brokerage Defendants as "not eligible for arbitration" renders the arbitral forum unavailable for the adjudication of her constitutional due process claim. Harris' interpretation of FINRA's dismissal decision ignores the fact that FINRA's dismissal of her re-filed claims was prompted by the Brokerage Defendants' request that FINRA's Director of Arbitration decline to permit the use of the FINRA arbitration forum because the "subject matter and relief sought" by the re-filed claims "are identical to that pursued" by Harris in earlier FINRA arbitrations. (Docket entry no. 47, Second Page Decl. Ex. F.) Because this objection relies, in part, on Harris' improper constitutional due process argument, and because nothing in the language of Harris' arbitration agreements or FINRA's dismissal decision suggests that Harris' constitutional due process claim cannot be arbitrated, this objection is overruled
Finally, Harris objects to the Report's conclusion that she has failed to state a claim for trespass.[1] Relying once again on her contention that the Complaint asserts a constitutional due process claim, Harris *175 argues that the Report "erroneously defined Harris's property by state commercial law instead of federal law," specifically, SEC Rule 15c3-3. (Objection at 37.) To the extent that Harris' objection is premised on a federal law property right not previously alleged in her Complaint or advanced in connection with the DTC Defendants' motion to dismiss, the Court declines to entertain Harris' argument at this late stage. To the extent that some version of this argument was presented in opposition to the DTC Defendants' motion to dismiss, the Court has reviewed Judge Moses' analysis of Harris' trespass claim de novo and for clear error, and finds no basis to sustain Harris' objection. Regardless of the source of Harris' alleged property rights, as explained in the Report, Harris has failed to state a claim for trespass to chattels under New York law. (See Report at 29-30.)
The Court has considered Harris' remaining objections and finds them to be without merit. Accordingly, and for substantially the reasons set forth in Judge Moses' thorough and well-reasoned Report, the Court overrules Harris' Objection in its entirety and adopts Judge Moses' Report and its recommended conclusions. Accordingly, the Brokerage Defendants' motions to compel arbitration and the DTC Defendants' motion to dismiss the Complaint are granted, and the case is hereby stayed and placed on the suspense calendar as to the Brokerage Defendants (TD Ameritrade Inc., TD Ameritrade Clearing, Inc., and Scottrade Inc.) and dismissed with prejudice as to the DTC Defendants (Depository Trust and Clearing Corporation, Depository Trust Company, and Cede & Co.). This case is hereby stayed pending the arbitration of Harris' claims against the Brokerage Defendants. The parties are directed to file a joint status report by April 5, 2019 and each January 5 and April 5 thereafter, stating whether this case should remain stayed, be restated to the active calendar, or be dismissed. This Memorandum Order resolves docket entry nos. 23, 27, 31 and 61.
SO ORDERED.
Plaintiff Jan Harris is the owner of 2,420,000 shares of penny stock issued by Bancorp International Group, Inc. ("Bancorp") and held in street name in her accounts at TD Ameritrade Inc. (together with TD Ameritrade Clearing, Inc., "TDA") and Scottrade Inc. ("Scottrade"). Since late 2009, plaintiff has sought to register the shares in her own name and obtain physical stock certificates evidencing her title. TDA and Scottrade (collectively the "Brokerage Defendants") have consistently demurred, explaining that Bancorp's stock is subject to a "global lock," imposed by the Depository Trust Company ("DTC") in 2005, which prevents them from transferring the record ownership of her shares.
Beginning in 2010, plaintiff brought a series of arbitration claims against the Brokerage Defendants before the Financial Industry Regulatory Authority ("FINRA"), seeking physical stock certificates for her Bancorp shares. She lost on the merits against Scottrade in 2011, and against TDA in 2014. She then refiled substantially the same claims, against the same firms, but FINRA summarily dismissed them.
In 2016, plaintiff brought suit in a Nevada state court against DTC, its parent Depository Trust and Clearing Corporation ("DTCC"), and its nominee Cede & Co. ("Cede") (collectively the "DTC Defendants"), seeking, among other things, declaratory and injunctive relief confirming her entitlement to physical stock certificates, *176 issued by Bancorp, in her name. In January 2017, the trial court dismissed her claims for lack of personal jurisdiction and as time-barred, and in February 2018 the Nevada Supreme Court affirmed on jurisdictional grounds.
In this action, filed pro se on August 9, 2017, plaintiff seeks equitable relief and damages against the Brokerage Defendants and the DTC Defendants, once again asserting that she is entitled to physical stock certificates reflecting her Bancorp shares. Count I alleges that each defendant is obligated to provide "an accounting ... with regard to the legal title to 2,420,000 shares of Bancorp which Harris is entitled to exclusive possession of." Compl. (Dkt. 1) ¶ 30. Count II alleges that by interfering with her "right to immediate and exclusive possession" of those shares, each defendant has committed and is committing "an ongoing trespass," id. ¶¶ 32, 36, entitling her to a mandatory injunction and unspecified damages. Id. at 13-14.
Now before me for report and recommendation are (1) the Brokerage Defendants' motions to dismiss plaintiffs' claims against them pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, to compel arbitration of those claims pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3 - 4 (Dkt. Nos. 23, 31); and (2) the DTC Defendants' motion to dismiss the claims against them pursuant to Rule 12(b)(6). (Dkt. No. 27.) For the reasons that follow I respectfully recommend that the Brokerage Defendants' motions to compel arbitration be GRANTED; that the DTC Defendants' motion to dismiss be GRANTED; and that this action be STAYED as to the Brokerage Defendants and DISMISSED WITH PREJUDICE as to the DTC Defendants.
I. FACTUAL BACKGROUND
In 2005, plaintiff purchased 900,000 shares of Bancorp common stock bearing CUSIP No. 05968X106 ("X106") though TDA, and another 1,520,000 shares through Scottrade. Compl. ¶¶ 5-6; see also Plaintiff's Objection to the Defendants' Motions to Dismiss ("Pl. Obj.") (Dkt. No. 43) at 18; Declaration of Jan Harris, filed Dec. 13, 2017 ("Harris Decl.") (Dkt. No. 37), Exs. 1, 2 (brokerage statements). Plaintiff "fully paid" for her shares at the time of her purchases and remains the "true and equitable owner of a total of 2,420,000 shares of Bancorp," all of which are held in "street name" by the brokerage firms through which she purchased them. Compl. ¶ 10.[1] Her equitable ownership of the stock is not in dispute: it is reflected in the books and records of the Brokerage Defendants, which send her periodic account statements showing that the Bancorp shares are in her accounts. Id. ¶¶ 5-6, *177 11-12; see also Pl. Obj. at 18; Harris Decl. Exs. 1, 2.[2]
A. The Global Lock and Delisting
On August 11, 2005, after Bancorp announced that unauthorized individuals had printed counterfeit certificates purporting to represent shares of its stock, DTC discontinued all services relating to Bancorp's X106 shares except custody services, thus imposing a global lock. See Declaration of Gregg M. Mashberg, dated Nov. 14, 2017 ("Mashberg Decl.") (Dkt. No. 29), Ex. C (DTC "Special Alert Regarding Bancorp International Group, Inc.").[3] Thereafter, on August 31, 2005, the SEC suspended trading in Bancorp's securities. See In re Bancorp International Group, Inc. , 2005 WL 3710976 (SEC Rel., Aug. 31, 2005) ; Mashberg Decl. Ex. E (Special Notice to Members regarding trading suspension). The global lock "remains in effect today." TD Ameritrade, Inc. v. Kelley , 2016 WL 5660399, at *1 (S.D.N.Y. Sept. 30, 2016).
Even before the counterfeiting fraud and the global lock, Bancorp - which traded in the pink sheets under the symbol BCIT - had been "a habitual delinquent filer," repeatedly failing to file the periodic reports required by the federal securities laws. See SEC Rel. No. 60920, 2009 WL 3633868, at *1 (Nov. 3, 2009). On November 3, 2009, describing Bancorp (by then known as Energy Source, Inc.) as a "shell corporation," the SEC revoked its registration and delisted its shares "for the protection of investors." Id. Bancorp stock has no discernable current market value.[4]
B. Plaintiff's Arbitration Claims Against the Brokerage Defendants
In 2004, when Harris opened her brokerage accounts at Scottrade, she agreed to be bound by Scottrade's Brokerage Account Agreement, which states, in relevant part:
*178 You [Harris] agree to settle by arbitration any dispute between you and Scottrade ... relating to your Brokerage Account(s). Any arbitration under this agreement will be conducted under the arbitration rules of [FINRA] or any national securities exchange of which Scottrade is a member. Arbitration may be initiated by either of us serving written notice to the other. The arbitrator's ruling will be final and judgment on it may be entered in any court of competent jurisdiction.
Affidavit of Harry Carr, filed Nov. 15, 2017 ("Carr Aff.") (Dkt. No. 33), Ex. 3, ¶ 21. The Scottrade agreement goes on to state that arbitration "is final and binding on the parties," who are "are waiving their right to seek remedies in court," and that the arbitrator's award "is not required to include factual findings or legal reasoning." Id.
Similarly, plaintiff's TDA customer agreement provides, in relevant part:
All controversies concerning (a) any transaction, (b) the construction, performance, or breach of this or any other agreement, whether entered into prior to, on, or after the date of the Agreement, or (c) any other matter which may arise between [TD] Ameritrade or its representatives and me [Harris] shall be determined by arbitration in accordance with the rules of [FINRA].
Page Decl. Ex. E, ¶ 92. The TDA agreement advises plaintiff that "[a]ll parties to this Agreement are giving up their right to sue each other in court ... except as provided by the rules of the arbitration forum in which a claim is filed," that arbitration awards are "generally final and binding," and that the arbitrators "do not have to explain the reason(s) for their award." Id. ¶ 91(a)-(d). In addition, the TDA agreement states, "The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement." Id. ¶ 91(f).
Beginning in December 2009, Harris was "in contact with Scottrade and TD Ameritrade about changing the form of my ownership from indirect to direct." Page Decl. Ex. B, at ECF page 3 (email from Harris to Page); see also Scottrade Mem. Ex. A, at ECF page 14 (December 29, 2009 letter from Harris to Scottrade demanding a physical certificate representing the 30,000 Bancorp shares in her Roth IRA account). On January 13, 2010, Scottrade explained that because of the global lock it "cannot issue a physical stock certificate at this time." Id. at ECF page 16. Similar correspondence followed. See, e.g. id. at ECF pages 18-21, 23-33 (Scottrade); Page Decl. Ex. A, at ECF pages 19-21 (TDA).
On December 29, 2010, Harris filed a FINRA arbitration claim against Scottrade, complaining that the firm failed to honor her "right ... to exit the indirect holding system and obtain physical possession of certificates for the common stock of BCIT." Scottrade Mem. Ex. A, at ECF page 3. On September 20, 2011, the arbitrator issued an award (the 2011 Award) denying Harris's claim on the merits. Scottrade Mem. Ex. B, at 1. The arbitrator explained that Scottrade "is not willfully refusing to deliver the shares. It cannot deliver the BCIT shares because of the actions of a third party, the Depository Trust & Clearing Corporation [DTCC], which placed a 'global lock' on BCIT, shares on August 16, 2005. The global lock means that the subject shares are not eligible for delivery, transfer, or withdrawal by any person or entity." Id. The arbitrator also noted that under Harris's agreement with Scottrade, the firm "will not be liable for any loss caused directly or indirectly by suspension of trading of a stock such as that of BCIT." Id. It does not *179 appear that Harris ever sought to vacate or modify the 2011 Award.
In 2011, Harris filed a similar FINRA arbitration claim against TDA. Page Decl. Ex. A. Plaintiff alleged that she requested the firm to obtain physical share certificates corresponding to her Bancorp holdings but that "[r]espondent refused to do so, and is withholding and failing to deliver my shares." Id. , at ECF page 4.
On October 4, 2011, plaintiff voluntarily withdrew her FINRA claim against TDA. Page Decl. Ex. C. In her withdrawal letter, Harris explained that she had received the arbitrator's decision in her parallel action against Scottrade and concluded "that the FINRA sponsored arbitral forum will not recognize or enforce my statutory and contractual rights." Id.
Notwithstanding the sentiments expressed in her 2011 withdrawal letter, Harris filed a new arbitration claim against TDA in 2013, seeking a physical stock certificate for her Bancorp shares. On April 2, 2014, the arbitrator issued an award (the 2014 Award) denying her 2013 claim, in its entirety, "in full and final resolution of the issues submitted for determination." See Second Declaration of Rodney F. Page, filed Jan. 17, 2018 ("Second Page Decl.") (Dkt. No. 47), Ex. F, at ECF page 4. It does not appear that Harris ever sought to vacate or modify the 2014 Award.
Later in 2014 - after learning that that other Bancorp investors had obtained awards in their favor from other FINRA arbitrators - plaintiff filed two more arbitration claims (one against each of the Brokerage Defendants), again seeking physical stock certificates for her Bancorp shares. See, e.g. , Scottrade Mem. Ex. C, at ECF page 2 ("I am requesting this panel ORDER respondent to comply with my order and register my 80,000 BCIT shares in my name as the FINRA arbitrator did in Lusk v. Scottrade (FINRA case # 14-00211) on August 13, 2014.").
On December 4, 2014, TDA asked FINRA to dismiss plaintiff's 2014 claim summarily, pursuant to Rule 12203(a) of the FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Code"),[5] because "the subject matter and relief sought" were identical to that pursued in her 2013 claim, which had been "denied and dismissed" in the 2014 Award, barring her later claim as a matter of res judicata. Second Page Decl. Ex. F, at ECF pages 2-3. On December 23, 2014, FINRA granted the request, advising Harris that her 2014 claim against TDA was "not eligible for arbitration," citing Rule 12203(a), and closing the case. See Page Decl. Ex. D; Harris Decl. Ex. 6.
On December 24, 2014, Scottrade asked FINRA to dismiss Harris's 2014 claim summarily, pursuant to Rule 12203(a), as precluded by the 2011 Award in Scottrade's favor, which was "final and binding." Scottrade Reply Aff. Ex. E, ¶ 5 ("Neither FINRA rules nor the Customer Code of Arbitration Procedure permit claimant a second bite at the apple."). Plaintiff opposed the request, stating in a January 15, 2015 letter to FINRA: "My brokerage agreement contractually obligates me to file my claim in this forum and Lusk v. Scottrade shows the relief I am requesting is within the mandate of this forum to provide. I respectfully request the Director to allow my claim to proceed."
*180 Scottrade Reply Aff. Ex. C. Nonetheless, on February 9, 2015, FINRA dismissed plaintiff's 2014 claim against Scottrade pursuant to Rule 12203(a). See Scottrade Mem. Ex. D; Harris Decl. Ex. 7.
C. Plaintiff's Nevada Lawsuit Against the DTC Defendants
In May 2016, through counsel, Harris filed a state court complaint in Nevada (where Bancorp is incorporated) against the DTC Defendants and Bancorp's stock transfer agent, Empire Stock Transfer Inc. (not a party here). Compl. ¶ 22; see also Mashberg Decl. Ex. B. As against the Nevada defendants, plaintiff sought a declaration that she is "entitled to be the direct owner and the registered record holder" of her Bancorp shares, an injunction, and damages. Mashberg Decl. Ex. B, at ECF pages 21-22. On January 31, 2017, the Second Judicial District Court dismissed the case, holding that it lacked personal jurisdiction over the defendants and that plaintiff's claims were barred by the applicable statute of limitations. Mashberg Decl. Ex. A. On February 15, 2018, the Supreme Court of Nevada affirmed the dismissal on personal jurisdiction grounds, without reaching the limitations issue. Harris v. Depository Trust & Clearing Corp. , 412 P.3d 12 (Nev. 2018) (unpublished table decision; full text available at 2018 WL 1009206 ).
D. This Action
Both of plaintiff's claims in this action are premised on state law agency theory. She alleges that the Brokerage Defendants act as her "agent[s]" and as such owe her fiduciary duties of good faith, loyalty and care. Compl. ¶¶ 5, 6. In addition, she alleges, since Cede "acts as a common nominee (agent) for shareholders whose shares are held in street name," it too is "required to faithfully follow [her] instructions with respect to the 2,420,000 shares of Bancorp," including her instructions - transmitted through the Brokerage Defendants - to reregister those shares in her name. Id. ¶ 15; see also id. ¶ 28 (alleging that Cede owes her a fiduciary duty because it "hold[s] legal title" to her Bancorp shares).[6] Harris explains that she "revoked the authority of each defendant individually and collectively to act as her holding agent or her nominee" when she requested that the shares be re-registered in her own name. Id. ¶ 16. Nonetheless, defendants "are continuing to hold Harris's shares in street name," id. ¶ 17, in breach of their duties as her agents.
In Count I, asserted against all defendants, Harris alleges that agents have a duty to account to their principals, and on that basis seeks an accounting, from all defendants, "with regard to the legal title to the 2,420,000 shares of Bancorp" in her accounts. Compl. ¶¶ 28, 30. In Count II, she alleges that by continuing to hold those shares in street name defendants are "interfering with Harris enjoying exclusive possession of her personal property," id. ¶¶ 33-34, which constitutes the tort of trespass. Id. ¶ 36.[7]
II. ANALYSIS
A. The Brokerage Defendants' Motions
The FAA provides that arbitration agreements "shall be valid, irrevocable, *181 and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Sections 3 and 4 of the FAA require a district court to compel the arbitration of claims subject to an arbitration agreement upon the application of either party to the agreement. Id. §§ 3, 4. "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd , 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).
As noted above, the Brokerage Defendants' motion is made in the alternative; they seek an order compelling arbitration if and "[t]o the extent" plaintiff's claims against them survive their motions to dismiss, made on limitations grounds. TDA Memorandum of Law ("TDA Mem.") (Dkt. No. 25), at 8. If plaintiff's claims are properly referable to arbitration, however, the identification and application of the appropriate limitations period is a question for the arbitrator. See Bechtel do Brasil Construcoes Ltda. v. UEG Araucaria Ltda. , 638 F.3d 150, 154 (2d Cir. 2011) ("the timeliness of UEGA's claims is a question for the arbitrator"); British Ins. Co. of Cayman v. Water St. Ins. Co. , 93 F. Supp. 2d 506, 520-21 (S.D.N.Y. 2000) ("it is a clearly established principle of arbitration law that 'it is up to the arbitrators, not the court, to decide the validity of time-bar defenses' ") (quoting Shearson Lehman Hutton, Inc. v. Wagoner , 944 F.2d 114, 121 (2d Cir. 1991), and collecting cases).
Moreover, because a motion to compel arbitration goes to the Court's power to hear a case, such a motion is analogous to - and sometimes treated as - a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). See, e.g. , Cartagena Enterprises, Inc. v. J. Walter Thompson Co. , 2013 WL 5664992, at *6 & n.34 (S.D.N.Y. Oct. 16, 2013) ; Rosehoff Ltd. v. Cataclean Americas LLC , 2013 WL 2389725, at *10 (W.D.N.Y. May 30, 2013) ; Tyler v. City of New York , 2006 WL 1329753, at *2 (E.D.N.Y. May 16, 2006). Since "jurisdiction generally must precede merits in dispositional order," Ruhrgas AG v. Marathon Oil Co. , 526 U.S. 574, 577, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (citing Steel Co. v. Citizens for Better Environment , 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ), a district court should generally rule on a motion to compel arbitration before proceeding to a merits-based motion to dismiss. See *182 Needham v. United States , 2018 WL 3611944, at *2 (S.D.N.Y. July 27, 2018) (quoting Spruill v. NYC Health & Hosp. , 2007 WL 2456960, at *1 (S.D.N.Y. Aug. 23, 2007) ) ("Courts are required to decide 'the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction.") (internal quotations marks omitted).
Even if the arbitration issue is not considered jurisdictional, it should ordinarily be addressed first as a matter of judicial efficiency. See Rosehoff Ltd. , 2013 WL 2389725, at *10 (assessing the parties' merits arguments, including "the sufficiency of the claims in the complaint," would be "unnecessary and contrary to judicial economy" if case must be stayed or dismissed in favor of arbitration); Bimota SPA v. Rousseau , 628 F. Supp. 2d 500, 502 (S.D.N.Y. 2009) (considering and granting defendants' motion to compel arbitration on all of plaintiff's claims, thus obviating need to consider partial motion to dismiss); Harris v. TD Ameritrade, Inc. , No. 4:14-CV-0046, slip op. at 3, 2015 WL 64880 (E. D. Tenn. Jan. 5, 2015) (granting motion to compel arbitration of claims by Bancorp shareholder challenging TDA's failure to take his shares out of street name, rendering it "unnecessary to address TDA's arguments in support of dismissal").
I therefore begin with the motions to compel arbitration.
B. Arbitration Should Be Compelled
In determining whether to compel arbitration, a district court engages in a four-step analysis, asking: "(1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration." Begonja v. Vornado Realty Trust , 159 F. Supp. 3d 402, 408-09 (S.D.N.Y. 2016) (citing Guyden v. Aetna, Inc. , 544 F.3d 376, 382 (2d Cir. 2008) ); see also Fleming v. J. Crew , 2016 WL 6208570, at *3 (S.D.N.Y. Oct. 21, 2016).
When performing this analysis, the court is not limited to the pleadings, and need not assume the truth of the facts alleged in the complaint. See Oppenheimer & Co. v. Neidhardt , 56 F.3d 352, 358 (2d Cir. 1995) (motions to compel arbitration require "a showing of evidentiary facts"). Rather, the court must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits," and draw all reasonable inferences in favor of the non-moving party. Nicosia v. Amazon.com, Inc. , 834 F.3d 220, 229 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc. , 282 F.3d 147, 155 (2d Cir. 2002) ).
Once the moving party has established the existence of an arbitration agreement, the burden shifts to the party "seeking to avoid arbitration" to "show[ ] the agreement to be inapplicable or invalid." Sajdlowska v. Guardian Serv. Indus., Inc. , 2016 WL 7015755, at *4 (S.D.N.Y. Dec. 1, 2016) (citing Harrington v. Atl. Sounding Co., Inc. , 602 F.3d 113, 124 (2d Cir. 2010) ). At this stage of the analysis, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp. , 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). "Accordingly, '[f]ederal policy requires us to construe arbitration clauses as broadly as possible ... unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' "
*183 Radio Computing Servs., Inc. v. Cool Partners, Inc. , 2001 WL 799579, at *1 (S.D.N.Y. July 12, 2001) (quoting David L. Threlkeld & Co. v. Metallgesellschaft Ltd. , 923 F.2d 245, 250 (2d Cir. 1991) (citations and quotations omitted) ).
In this case, the parties dispute only one relevant issue: the scope of plaintiff's agreements to arbitrate. The Brokerage Defendants point to the inclusive language of their customer agreements - requiring plaintiff to arbitrate "all controversies" with TDA, see Page Decl. Ex. E, ¶ 92, and "any dispute" with Scottrade relating to her accounts there, see Carr Aff. Ex. 3, ¶ 21 and argue that these clauses necessarily cover her accounting and trespass claims, barring her from pursuing them in this Court. See TDA Mem. at 9; Scottrade Mem. at 12-14.
Plaintiff contends that, notwithstanding the breadth of the mandatory arbitration language at issue,[8] "there is no agreement to arbitrate this type of claim in the first place." Pl. Obj. at 26. She reasons that since FINRA summarily dismissed her 2014 claims as "not eligible for arbitration," it has effectively ruled that none of her claims - including those asserted here - are "eligible for arbitration" under FINRA's rules. Pl. Obj. at 30. Therefore, she says, those claims cannot come within the scope of her arbitration agreements, which "reflect an intent to arbitrate exclusively before FINRA." Id. at 29. Even more fundamentally, plaintiff argues, FINRA never "adopted rules that authorize its arbitrators to resolve this type of claim," which - together with the dismissal of her 2014 claims - shows that "it is impossible to resolve this type of claim under FINRA's code." Id. at 32. Plaintiff is mistaken on both counts.
The Second Circuit has prescribed a two-step inquiry to determine whether a dispute falls within a particular arbitration clause: "First, recognizing some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc. , 252 F.3d 218, 224 (2d Cir. 2001). "Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.' " Id. (quoting Collins & Aikman Prods. Co. v. Bldg. Sys., Inc. , 58 F.3d 16, 23 (2d Cir. 1995) ).
The arbitration clauses at issue here are unmistakably broad. See Collins & Aikman , 58 F.3d at 20 ("The clause in this case, submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause."); Merrick v. UnitedHealth Grp Inc. , 127 F. Supp. 3d 138, 151 (S.D.N.Y. 2015) ("Arbitration provisions applying to "any disputes" connected to *184 the parties' agreement are usually interpreted broadly by courts in this Circuit") (collecting cases); In re Refco Inc., Sec. Litig. , 2009 WL 10666107, at *15 (S.D.N.Y. Nov. 20, 2009), report and recommendation adopted , 2010 WL 11500548 (S.D.N.Y. Jan. 21, 2010) (arbitration clause covering "any dispute" arising out of a contract was "classically broad"). In this case plaintiff's arbitration obligation is not even limited to claims arising out of her contracts with the Brokerage Defendants. She agreed to arbitrate any dispute relating to her accounts at Scottrade, see Carr Aff. Ex. 3, ¶ 21, and "[a]ll controversies concerning ... any transaction ... or ... any other matter which may arise" between plaintiff and TDA. Page Decl. Ex. E, ¶ 92 (emphases added).[9] Thus, there can be no serious question but that plaintiff's current claims - alleging that the Brokerage Defendants violated state law when they failed to take her Bancorp shares out of street name - are within the scope of her agreements to arbitrate.
"[I]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." David L. Threlkeld & Co. , 923 F.2d at 251 (quoting AT & T Technologies, Inc. v. Communications Workers of Am. , 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ). There is no such evidence here. Plaintiff's contention that she need not arbitrate her claims because FINRA did not adopt specific "rules to resolve a claim where an investor desired to remove her shares from a third-party depository which [another rule] mandates it members such as Scottrade and TDA use," Pl. Obj. at 31-32, gets the Threlkeld standard backwards. Neither FINRA nor any other arbitral forum is required to craft special rules to resolve each conceivable type of claim that may come before it.[10]
Nor can plaintiff rely on the summary dismissals of her 2014 FINRA claims under Rule 12203(a). Those claims were not deemed ineligible for arbitration because of the "type of claim" that plaintiff filed; they were deemed ineligible because she had already filed the same claims, which had already been arbitrated and decided, on the merits, by the 2011 Award and the 2014 Award. Pursuant to Rule 12904(b) of the FINRA Code, those awards were "final." Thus, by dismissing plaintiff's attempt to re-arbitrate the same claims (in hopes of a better result), FINRA was affirming not only that such claims could be resolved in arbitration but that plaintiff's claims had been so resolved and - in accordance with Rule 12904(b) - would stay resolved.
Plaintiff's reliance on In re Salomon Shareholders' Derivative Litig. , 68 F.3d 554 (2d Cir. 1995), is misplaced. In Salomon , the district court granted defendants' motion to compel arbitration of a shareholder derivative suit before the New York Stock Exchange ("NYSE"). The NYSE, *185 which had never previously been presented with the plaintiffs' claims, "declined to arbitrate the dispute" because, among other things, it was a shareholder derivative suit. Id. at 556 ("shareholders' derivative litigation, which is governed by Fed. R. Civ. P. 23.1, is foreign to the procedures and mechanisms employed in NYSE arbitration"); see also id. at 560 (the NYSE declined to "accept the matter for arbitration because of the problems shareholder derivative suits pose").[11] The case then returned to the district court, whereupon defendants asked the judge to appoint substitute arbitrators and compel arbitration "in another forum." Id. at 559. The district judge refused, and the Second Circuit affirmed, because "the parties had contractually agreed that only the NYSE could arbitrate any disputes between them." Id.
Here, by way of contrast, there is clearly no general bar to FINRA arbitration of claims such as plaintiff's. FINRA took, and resolved, her claims against Scottrade in 2011 and against TDA in 2014. It also took, and resolved, the claims of dozens of other Bancorp investors who - like plaintiff - wanted physical stock certificates reflecting their Bancorp holdings. Some of those claimants prevailed in arbitration.[12] But plaintiff did not prevail. She lost, on the merits, against Scottrade in 2011 and against TDA in 2014. On this record, it is clear that FINRA's refusal to give her a do-over had nothing to do with the scope of her arbitration agreement or the power of a FINRA arbitrator to decide her rewarmed claims. To the contrary: those claims were dismissed under Rule 12203(a) because they had already been decided. Regardless of the language used in FINRA's decision, this too was a merits determination, bottomed on "the preclusive effect of a prior, related arbitration between the parties." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Petroleum Corp. , 88 F.3d 129, 131, 135 (2d Cir. 1996) ; see also Citigroup, Inc. v. Abu Dhabi Inv. Auth. , 776 F.3d 126, 131 (2d Cir. 2015) (Belco established that claim preclusion is "not a question of arbitrability" but rather a "legal defense to the opposing party's claims").
Once again confusing arbitrability with winnability, plaintiff cites Judge Crotty's opinion in Kelley - which held that TDA could not "transfer to Kelly the physical share certificate for his X106 shares" because they were "subject to DTC's global lock," 2016 WL 5660399, at *3 - for the proposition that "the arbitrator had no power to order the shares registered in Harris's name." Pl. Obj. at 34. Kelley was filed after a FINRA arbitrator ordered TDA to deliver a physical share certificate to the claimant and pay damages of $1,610.98. TDA asked the district court to vacate the injunctive portion of the award - not because the arbitrator lacked jurisdiction or power to issue it but because TDA could not lawfully comply with it. Noting that "an award may be set aside if it compels the violation of law," 2016 WL 5660399, at *3 (quoting *186 Perma-Line Corp. of Am. v. Sign Pictorial & Display Union, Local 230, Int'l Brotherhood of Painters & Allied Trades, AFL-CIO , 639 F.2d 890, 895 (2d Cir. 1981) ), Judge Crotty agreed that, due to the global lock, TDA could not "provide Kelley with a physical share certificate for Bancorp shares," id. at *4, and on that basis vacated the award in part. Nothing in Kelley suggests, even remotely, that the underlying claim was "not arbitrable under FINRA's Code." Pl. Obj. at 34.[13]
The question for this Court is a narrow one: whether the claims contained in plaintiff's Complaint are within the scope of her arbitration agreements with the Brokerage Defendants. In December 2015, plaintiff readily conceded the issue, telling FINRA that she was contractually obligated "to file my claim in this forum." Scottrade Reply Aff. Ex. C. As to that point, she was correct. Nothing in the FINRA Code, and nothing that has occurred since she made that statement (including the summary dismissal of her last two arbitration claims by FINRA on preclusion grounds and the vacatur of the FINRA award in Kelley on impossibility grounds) demonstrates that plaintiffs arbitration agreements are "inapplicable" to her present claims or "invalid." Sajdlowska , 2016 WL 7015755, at *4. Plaintiff has therefore failed to carry her burden, and cannot pursue her accounting and trespass claims against the Brokerage Defendants in this forum. Because those claims must be pursued in arbitration, if at all,[14] there is no need for this Court to consider the Brokerage Defendants' alternative motions to dismiss them as time-barred.
For these reasons, I respectfully recommend that the motions to compel arbitration be GRANTED and that plaintiff's claims against the Brokerage Defendants be STAYED.[15]
C. The DTC Defendants' Motion
When considering a Rule 12(b)(6) motion, the trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet Corp. , 482 F.3d 184, 191 (2d Cir. 2007). However, the court may not credit "legal conclusions couched as factual allegations." Starr v. Sony BMG Music Entm't , 592 F.3d 314, 321 (2d Cir. 2010) (quoting Port Dock & Stone Corp. v. Oldcastle Northeast, Inc. , 507 F.3d 117, 121 (2d Cir. 2007) ); see also *187 Harris v. Mills , 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ) ("although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions' ").
To survive a motion to dismiss, the plaintiff's well-pleaded factual allegations "must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This pleading standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Geldzahler v. N.Y. Med. Coll. , 663 F. Supp. 2d 379, 385 (S.D.N.Y. 2009) (internal quotation marks omitted). At a minimum, the complaint must give each defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Littlejohn v. City of New York , 795 F.3d 297, 309 (2d Cir. 2015) (quoting Swierkiewicz v. Sorema N.A. , 534 U.S. 506, 507, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ).
Although a party seeking dismissal pursuant to Rule 12(b)(6) may not rely on extrinsic evidence, it may cite - and the district court may consider - any documents "integral" to the complaint and any matters of which the court may take judicial notice. Nicosia , 834 F.3d at 231. "Matters judicially noticed by the District Court are not considered matters outside the pleadings." Staehr v. Hartford Fin. Servs. Grp., Inc. , 547 F.3d 406, 426 (2d Cir. 2008). Thus, "the Court may take judicial notice of certain matters of public record without converting the motion into one for summary judgment," including "documents publicly filed with the SEC or FINRA, documents filed with a Secretary of State, [and] documents filed with governmental entities and available on their official websites." Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC , 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015). See also Harris v. New York State Department of Health , 202 F. Supp. 2d 143, 173 n.13 (S.D.N.Y. 2002) (district court may judicially notice "admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action"). "The plain purpose of th[is] exception is to prevent plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." Abdul-Rahman v. City of New York , 2012 WL 1077762, at *3 (E.D.N.Y. Mar. 30, 2012) (quotations and citations omitted).
A pro se plaintiff is "entitled to special solicitude." Fowlkes v. Ironworkers Local 40 , 790 F.3d 378, 387 (2d Cir. 2015) (quoting Triestman v. Fed. Bureau of Prisons , 470 F.3d 471, 477 (2d Cir. 2006) (per curiam) ). When considering a motion to dismiss the court must read her pleadings to "raise the strongest arguments that they suggest." Triestman , 470 F.3d at 477. See also Erickson v. Pardus , 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers") (internal quotation marks and citation omitted). Consistent with this approach, factual allegations made in a pro se plaintiff's opposition papers may be considered "as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint." George v. Pathways to Hous., Inc. , 2012 WL 2512964, at *6 n.7 (S.D.N.Y. June 29, 2012) ; see also Scott v. Warden & Adm'r of Jurisdiction Correction Dep't & Med. Dep't , 2010 WL 3785252, at *4 (S.D.N.Y. Aug. 23, 2010) ("Because the plaintiff is proceeding pro se , the Court may also rely on the plaintiff's opposition papers in assessing *188 the legal sufficiency of his claims.").
However, "the appropriate degree of special solicitude is not identical with regard to all pro se litigants." Tracy v. Freshwater , 623 F.3d 90, 102 (2d Cir. 2010). "[T]he degree of solicitude may be lessened where the particular pro se litigant is experienced in litigation and familiar with the procedural setting presented." Id. Regardless of the degree of solicitude extended, a pro se plaintiff, like any other plaintiff, "must state a plausible claim for relief." Walker v. Schult , 717 F.3d 119, 124 (2d Cir. 2013). Thus, the district court "cannot invent factual allegations that [the plaintiff] has not pled." Chavis v. Chappius , 618 F.3d 162, 170 (2d Cir. 2010).
D. Plaintiffs Claims Against the DTC Defendants Should Be Dismissed
The DTC Defendants contend that plaintiff's claims against them should be dismissed pursuant to Rule 12(b)(6) because (a) they are time-barred; (b) plaintiff fails to state a cause of action for an accounting or trespass; and (c) "this case is within the primary jurisdiction of the SEC." DTC Defendants' Memorandum of Law ("DTC Mem.") (Dkt. No. 28), at 3-4. The statute of limitations is "normally an affirmative defense." Bano v. Union Carbide Corp. , 361 F.3d 696, 710 (2d Cir. 2004). Thus, a motion to dismiss on limitations grounds admits (or does not contest) that "the claim is stated adequately," but argues that "the complaint includes matters of avoidance that effectively vitiate the pleader's ability to recover on the claim." 5B Wright & Miller, Federal Practice and Procedure § 1357, at 713 (3d ed. 2004). The defense must "appear[ ] on the face of the complaint," Bruno v. Casella Waste Sys., Inc. , 616 F. App'x 20, 20 n.1 (2d Cir. 2015) (quoting Ellul v. Congregation of Christian Bros. , 774 F.3d 791, 798 n.12 (2d Cir. 2014) ), including documents integral to the complaint, or arise from "matters of which judicial notice may properly be taken." Landow v. Wachovia Sec., LLC , 966 F. Supp. 2d 106, 128 (E.D.N.Y. 2013) (dismissing securities fraud claims as time-barred in reliance on media reports and prior court filings).
In the Nevada action, the trial court relied on the 2011 Award to find that all of plaintiff's claims against DTC and its affiliates were time-barred. See Mashberg Decl. Ex. A, at 11 ("Plaintiff knew or in the exercise of proper diligence should have known of the facts constituting the elements of her cause of action on September 20, 2011, when the FINRA decision was issued."). However, as noted above, the Nevada Supreme Court did not reach the limitations issue, see Harris v. Depository Trust & Clearing Corp. , 2018 WL 1009206 at *2, and the case was dismissed without prejudice. I therefore begin at the logical beginning of the DTC Defendants' motion, and consider whether plaintiff has pleaded facts sufficient to state the necessary elements of the claims she seeks to assert in this forum. I conclude that she has not.
1. Plaintiff Fails to State an Accounting Claim
To obtain an accounting under New York law, the plaintiff must show: " '(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal.' " NEM Re Receivables, LLC v. Fortress Re, Inc. , 173 F. Supp. 3d 1, 5 (S.D.N.Y. 2016) (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc. , 837 F.Supp.2d 162, 207 (S.D.N.Y. 2011) ); accord *189 Dayan Enterprises, Corp. v. Nautica Apparel, Inc. , 2003 WL 22832706, at *1 (S.D.N.Y. Nov. 26, 2003).
"Proof of a fiduciary relationship is a mandatory element of an accounting claim under New York law." Faulkner v. Arista Records LLC , 602 F. Supp. 2d 470, 484 (S.D.N.Y. 2009). "Where a party bringing an action for an accounting has 'failed to allege the existence of a fiduciary or otherwise confidential relationship ... the accounting claim merits dismissal.' " MacCartney v. O'Dell , 2016 WL 815279, at *5 (S.D.N.Y. Feb. 29, 2016) (quoting Sarafianos v. Shandong Tada Auto-Parking Co. , 2015 WL 2198499, at *3 (S.D.N.Y. May 8, 2015) ); see also Von Rohr Equip. Corp. v. Tanner Bolt & Nut Corp. , 2017 WL 5184676, at *9 (E.D.N.Y. Nov. 7, 2017) (quoting LoGerfo v. Trs. of Columbia Univ. in the City of N.Y. , 35 A.D.3d 395, 827 N.Y.S.2d 166, 169 (2006) ) ("The right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest.").[16]
The DTC Defendants argue, correctly, that plaintiff fails to allege facts showing the existence of a fiduciary relationship with them. The Complaint says nothing at all about her relationship with DTCC or DTC. As to Cede, plaintiff alleges only that it holds "bare legal title" to her Bancorp shares, from which she concludes that it is her "agent." Compl. ¶¶ 9, 15. This is not enough. See PetEdge, Inc. v. Garg , 234 F. Supp. 3d 477, 498 (S.D.N.Y. 2017) (dismissing claim where plaintiff's allegations were "nothing more than bare recitations of the legal elements of a fiduciary duty" and plaintiff failed to allege "that it had even a single communication or other contact directly with [defendant]"); see also 4C Robert L Haig, Commercial Litigation in New York State Courts § 85:47 (4th ed.) (an "agency relationship" will not "in and of itself entitle the principal to an accounting; rather, the plaintiff "must demonstrate a breach of a fiduciary duty").
Moreover, plaintiff concedes that what Cede holds title to is a "fungible pool" of Bancorp shares, represented by "one or more jumbo certificates which DTC safeguards in its vaults." Compl. ¶ 9. DTC maintains that pool on behalf of "Participants" such as TDA and Scottrade, who may, in turn, hold shares in street name for their respective customers. Id. ¶¶ 8-9, 21. DTC's records "show a total of 328,357,120 shares of Bancorp held by DTC on behalf of DTC Participants, including Scottrade and TD Ameritrade." Id. ¶ 21 (emphasis added). Of those 328 million shares, 117,427,010 are "credited to TD Ameritrade's DTC account." Id. ¶ 11. Another 48,780,942 shares are "credited to Scottrade's DTC account." Id. ¶ 12. Harris's equitable ownership of some of those shares is known only to (and shown only in the books and records of) the Participants through which she made her purchases. See id. ¶ 10 ("the evidence of Harris as the true owner of the shares is recorded in the books and records of financial intermediaries such as Scottrade and TDA").
As these allegations make clear, plaintiff does not own any specific shares of Bancorp, and has no direct claim on any property held by the DTC Defendants. Rather - as she correctly explained to FINRA in 2010 (when she filed a claim against Scottrade) and in 2011 (when she sought relief against TDA) - she is an "entitlement *190 holder" as to her brokers, and her brokers are "entitlement holders" as to DTC. See Scottrade Mem. Ex. A, at ECF pages 4-5; Mashberg Decl. Ex. H, at ECF pages 5-6; see also N.Y. U.C.C. § 8-501(b)(l) (a person acquires a security entitlement if a securities intermediary ... indicates by book entry that a financial asset has been credited to the person's securities account"); id. § 8-503(b) ("an entitlement holder's property interest with respect to a particular financial asset ... is a pro rata property interest in all interests in that financial asset held by the securities intermediary").
It is fundamental to Article 8 of the Uniform Commercial Code, which governs the indirect holding system summarized above, that "a securities intermediary owes duties only to its own entitlement holders." N.Y. U.C.C. § 8-115 cmt. 4. Thus, except in "extremely unusual circumstances" not present here, the entitlement holder can look only to its own intermediary to enforce the "package of rights and interests" represented by the entitlement. Id. § 8-503 cmt. 2. She "cannot assert rights directly against other persons, such as other intermediaries through whom the intermediary holds the positions." Id. Put plainly, "there are no legal rights under Article 8 against persons up the indirect holding chain." Russell A. Hakes, UCC Article 8: Will the Indirect Holding of Securities Survive the Light of Day? , 35 Loy. L.A. L. Rev. 661, 690 (2002).
While this absence of rights may be distressing to an entitlement holder, it is not astounding because it is inherent in the indirect holding system. No one in the indirect holding chain, except the immediate securities intermediary, has any way of knowing that the entitlement holder has an interest in the financial asset.
Id.[17]
Article 8 supplants any contrary common-law principles. See N.Y. U.C.C. § 8-503 cmt. 2 ("[T]he incidents of this property interest are established by the rules of Article 8, not by common law property concepts."); see also In re Lehman Bros. Holdings Inc. , 2018 WL 1441407, at *8 (S.D.N.Y. Mar. 22, 2018) ("the UCC displaced LBI's common law duties"); S.E.C. v. Credit Bancorp, Ltd. , 2000 WL 1752979, at *24 (S.D.N.Y. Nov. 29, 2000) ("the property rights of securities entitlements holders over assets held by securities intermediaries are defined by Article 8 rather than by common law"), aff'd , 290 F.3d 80 (2d Cir. 2002). Accord Hakes, U.C.C. Article 8, supra , at 686. For this reason - as well as the factual concessions that plaintiff has already made concerning the absence of any direct relationship with the DTC Defendants - I conclude that leave to amend would be futile.[18] I therefore recommend, respectfully, *191 that plaintiff's accounting claim against the DTC Defendants be DISMISSED WITH PREJUDICE.
2. Plaintiff Fails to State a Trespass Claim
New York looks to the Restatement of Torts to define trespass to chattels. See Register.com, Inc. v. Verio, Inc. , 356 F.3d 393, 404 (2d Cir. 2004). "A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." Restatement (Second) of Torts § 217 (1965). The trespasser is liable to "the possessor of the chattel" only if (as relevant here) he "dispossesses the other of the chattel," or "the chattel is impaired as to its condition, quality, or value," or "the possessor is deprived of the use of the chattel for a substantial period of time." Id. § 218.
The DTC Defendants contend that the tort also requires "physical interference" with the plaintiff's personal property. DTC Mem. at 21 (citing Chevron Corp. v. Donziger , 871 F. Supp. 2d 229, 258-59 (S.D.N.Y. 2012) ). They urge this Court to dismiss the claim because they could not have "physically interfered" with any personal property in plaintiff's possession. Id. at 21-22. Moreover, according to the DTC Defendants, "plaintiff's interest in BCIT shares is not ownership of personal property," because it is "not a claim to a specific identifiable thing." Id. at 22 (quoting N.Y. U.C.C. § 8-503 cmt. 2); see also Reply Memorandum of Law of the DTC Defendants (Dkt. No. 48) at 4 (arguing that plaintiff's securities entitlements are not "chattel" because they are not "moveable or transferrable personalty").
I disagree. To be sure, many cases - including cases in this Court - continue to recite the traditional requirement that a plaintiff suing for trespass to chattels allege "physical interference" with a "tangible object." See, e.g. , Donziger , 871 F. Supp. 2d at 258-59 (dismissing trespass claim alleging that defendants engaged in "vexatious litigation" that damaged plaintiff's reputation and pocketbook); Biosafe-One, Inc. v. Hawks , 639 F. Supp. 2d 358, 368 (S.D.N.Y. 2009) (dismissing claim arising from defendants' copying of plaintiff's business website), aff'd , 379 F. App'x 4 (2d Cir. 2010) ; In re Jetblue Airways Corp. Privacy Litig. , 379 F. Supp. 2d 299, 327-28 (E.D.N.Y. 2005) (dismissing claim arising out of airline's transfer of personally-identifying passenger information to third party).[19]
For the past quarter-century, however, the New York courts have recognized that intangible property may under certain circumstances be the subject of a trespass claim. See Kronos, Inc. v. AVX Corp. , 81 N.Y.2d 90, 95, 595 N.Y.S.2d 931, 935, 612 N.E.2d 289 (1993) (where, "as in the present case," the trespass alleged is "to an intangible property right arising under contract," an "actual loss" must be demonstrated as an element of the tort). In 2007, the New York Court of Appeals formally recognized that the related tort of conversion "must keep pace with the contemporary *192 realities of widespread computer use," and held that "electronic records that were stored on a computer and were indistinguishable from printed documents" are "subject to a claim of conversion in New York." Thyroff v. Nationwide Mut. Ins. Co. , 8 N.Y3d 283, 292-93, 832 N.Y.S.2d 873, 879, 864 N.E.2d 1272 (2007). Although Thyroff "did not consider" how far the newly-announced principle would extend, one of the examples given by the Court of Appeals suggested that uncertificated stock could also be the subject of such a claim:
Now, however, it is customary that stock ownership exclusively exists in electronic format. Because shares of stock can be transferred by mere computer entries, a thief can use a computer to access a person's financial accounts and transfer the shares to an account controlled by the thief.
Thyroff , 8 N.Y.3d at 292, 832 N.Y.S.2d at 879, 864 N.E.2d 1272. See also Salonclick LLC v. SuperEgo Mgmt. LLC , 2017 WL 239379, at *4 (S.D.N.Y. Jan. 18, 2017) (holding that domain names and social media accounts were "property" capable of being trespassed upon, but that plaintiff failed to state a trespass claim where it failed to allege "that Defendants' trespass has caused injury to the chattel - that is, the domain names or social media accounts") (emphasis in the original); DeAngelis v. Corzine , 17 F. Supp. 3d 270, 283 (S.D.N.Y. 2014) (holding that "segregated and identifiable funds" could constitute a "chattel" for purposes of a trespass claim); Phansalkar v. Andersen Weinroth & Co., L.P. , 175 F. Supp. 2d 635, 642 (S.D.N.Y. 2001) (holding that plaintiff's "intangible" ownership interest in a close corporation that never issued stock certificates could be the subject of a conversion claim).
I assume, after Kronos and Thyroff , that shares of stock existing only "in electronic format" could, in theory, be the subject of a claim for trespass to chattels under New York law. Plaintiff, however, has not stated such a claim.
First, plaintiff never had that which she accuses the DTC Defendants of interfering with: "exclusive possession" of her Bancorp shares, evidenced by "one or more stock certificates issued by Bancorp." Compl. ¶¶ 32-36. See also Pl. Obj. at 17 (plaintiff seeks "full ownership of shares of Bancorp that trade in the market"). She concedes this point in her Complaint, alleging only that she had a "constitutionally protected right to enjoy exclusive possession" of her shares and a "Nevada statutory right to possess" the corresponding stock certificates. Id. ¶ 36. Whether or not she had such rights, she cannot enforce them by means of a common-law trespass claim, which does not lie to compel a defendant to provide a benefit that the plaintiff never previously enjoyed (such as "exclusive possession"), or a tangible object that she never previously possessed (such as a stock certificate). To the contrary: the defendant must have intentionally and affirmatively "us[ed] or intermeddl[ed] with a chattel that was "in the possession" of the plaintiff Restatement (Second) of Torts § 217(b).
Second, plaintiff does not allege any actual "use" or "intermeddling" by the DTC Defendants. To the contrary: her claim is that these defendants have continually failed to follow her instructions, see Compl. ¶ 18, and have done nothing , despite her request, to convert her shares from street name into direct registration. See Compl. ¶ 34 ("By continuing to hold Harris's shares of Bancorp in street name, the defendants ... are ... interfering with Harris enjoying exclusive possession of her personal property"); id. ¶ 35 ("By continuing to hold Harris's shares of Bancorp in street name, the defendants ...
*193 are ... interfering with Harris's statutory right to possess one or more stock certificates issued by Bancorp to evidence Harris's ownership" of her shares).
Third, plaintiff does not allege that "the chattel is impaired as to its condition, quality, or value," as required to state a trespass claim. Register.com , 356 F.3d at 404 (quoting Restatement (Second) of Torts § 218(b) ). Like the unsuccessful plaintiffs in Salonclick , 2017 WL 239379, at *4, and Jetblue , 379 F. Supp. 2d at 328-29, plaintiff alleges only that she has been harmed; the X106 shares themselves, she insists, are worth many times what she paid for them. Pl. Obj. at 11-12. Plaintiff has therefore failed to "establish[ ] that [she] suffered the type of harm that may be redressed through a claim for trespass to chattels." Jetblue , 379 F. Supp. 2d at 329.
Fourth and finally, plaintiff cannot pursue the DTC Defendants on a theory of common-law trespass because, as discussed above, her rights as an entitlement holder are "defined by Article 8 rather than by common law." Credit Bancorp , 2000 WL 1752979, at *24. Article 8 generally requires plaintiff to look only to her own intermediaries - the Brokerage Defendants - to enforce the "package of rights and interests" represented by the entitlement. N.Y. U.C.C. § 8-503 cmt. 2. She "cannot assert rights directly against other persons, such as other intermediaries through whom the intermediary holds the positions."Id.
I conclude, once again, that leave to amend would be futile. I therefore recommend, respectfully, that plaintiff's trespass claim against the DTC Defendants be DISMISSED WITH PREJUDICE, obviating the need to consider their remaining arguments.
III. CONCLUSION
For the reasons stated above, I respectfully recommend that the Brokerage Defendants' motions to compel arbitration (Dkt. Nos. 23, 31) be GRANTED; that the DTC Defendants' motion to dismiss (Dkt. No. 27) be GRANTED; that plaintiff's claims against the Brokerage Defendants be STAYED; and that her claims against the DTC Defendants be DISMISSED WITH PREJUDICE.
The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to plaintiff.
Dated: New York, New York
August 14, 2018
NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION
The parties shall have fourteen days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b). See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Hon. Laura Taylor Swain at 500 Pearl Street, New York, New York 10007, and to the chambers of the Hon. Barbara Moses at the same address. Any request for an extension of time to file objections must be directed to Judge Swain. Failure to file timely objections will preclude appellate review. See Thomas v. Arn , 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) ; Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C. , 596 F.3d 84, 92 (2d Cir. 2010).

In her Objection, Harris abandons her request for an accounting. (See Objection at 31.)

The Securities and Exchange Commission (SEC) explains this common arrangement as follows: "When you buy securities through a brokerage firm, most firms will automatically put your securities into 'street name.' This means your brokerage firm will hold your securities in its name or another nominee and not in your name, but your firm will keep records showing you as the real or 'beneficial owner.' You will not get a certificate, but will receive an account statement from your broker on at least a quarterly and annual basis showing your holdings." SEC, "Fast Answers," https://www.sec.gov/fast-answers/answersstreethtm.html (last visited August 13, 2018). Both TDA and Scottrade use Cede as the nominee for the registration of securities at DTC, which is "the nation's central securities depository." SEC Rel. No. 34-79488, 2016 WL 7115454, at *1 (Dec. 6.2016). Thus, Harris alleges, Cede holds legal title to her Bancorp shares, which are carried on DTC's books "credited" to the account of TDA or Scottrade, as the case may be. Compl. ¶¶ 11, 12. The brokerage firms, in turn, "provide[ ] Harris periodic account statements showing her ... shares of Bancorp are carried on her behalf in street name." Id. ¶ 5, 6.

Plaintiff's TDA statements show that she paid $6,573.96 for the 900,000 X106 shares held in that account, which is equivalent to approximately 3/4 of one cent per share. Harris Decl. Ex. 1, at ECF page 5; see also Declaration of Rodney F. Page, filed Nov. 14, 2017 ("Page Decl.") (Dkt. No. 30), Ex. A, at ECF page 22 (plaintiff's TDA "Account History," showing Bancorp purchases at prices ranging from 19/100 of one cent to 2-1/2 cents per share). Her Scottrade trade confirmations show that she paid comparable prices for the X106 shares she purchased in her Scottrade accounts. See, e.g. , Scottrade Memorandum of Law ("Scottrade Mem.") (Dkt. No. 34), Ex. A, at ECF pages 35 (91/100 of a cent), 38 (5 cents).

See also SEC Rel. No. 34-79488, 2016 WL 7115454, at *2-3 (explaining the effect of a DTC global lock); TD Ameritrade, Inc. v. Kelley , No. 15-CV-714, slip op. at 12 (S.D.N.Y. Aug. 1, 2016), report and recommendation adopted , 2016 WL 5660399 (S.D.N.Y. Sept. 30, 2016) (explaining that the Bancorp global lock made it "impossible" to "obtain the physical stock certificate" for shares held at a brokerage firm in street name).

Harris's TDA statements list the value of her Bancorp shares as "NA." Harris Decl. Ex. 1. Her Scottrade statements list them at zero. Id. Ex. 2. As of its last publicly-filed annual report, in 2008, Bancorp had one unpaid employee - its CEO, Thomas Megas - had conducted no business activities since 2000, had never generated any revenue, and had an accumulated deficit of $4.9 million. See Bancorp Int'l Group, Inc. Form 10-KSB (April 3, 2008), at 2-9, available at https://www.sec.gOv/Archives/edgar/data/1076779/000114420408020290/v108815_10ksb.htm (last visited August 13, 2018). In her 2010 Scottrade arbitration claim, Harris asserted (based on an email from Megas) that the replacement value of her stock was 15 cents per share. See Scottrade Mem. Ex. A, at ECF pages 12-13. In this Court, plaintiff asserts (in her brief, without citation or evidence) that by 2013 shares of Bancorp were trading at 40 cents per share, but "only in the private markets by private treaty." Pl. Obj. at 12.

Rule 12203(a) states: "The Director may decline to permit the use of the FINRA arbitration forum if the Director determines that, given the purposes of FINRA and the intent of the Code, the subject matter of the dispute is inappropriate, or that accepting the matter would pose a risk to the health or safety of arbitrators, staff, or parties or their representatives." See Scottrade Reply Affirmation, filed Jan. 17, 2018 ("Scottrade Reply Aff") (Dkt. No. 46), Ex. D.

The Complaint does not allege, even in conclusory terms, that DTC or DTCC is plaintiff's agent or nominee.

Although both of her claims are asserted under state law, plaintiff invokes federal question jurisdiction, see Compl. ¶ 2 (citing 28 U.S.C. § 1331 ), on the theory that this Court must "interpret the Exchange Act of 1934" in order to determine whether it "provide[s] a legal privilege for any of the defendants to interfere with Harris enjoying exclusive possession of the 2,420,000 shares of Bancorp she owns." Id. at ¶ 2. It is well-settled, however, that "in assessing whether federal question jurisdiction lies," the court must "ask if the well-pleaded complaint asserts a federal claim on its face." City of Rome, N. Y. v. Verizon Commc'ns, Inc. , 362 F.3d 168, 174 (2d Cir. 2004). "The mere existence or invocation of a federal defense does not furnish a sufficient basis for jurisdiction to attach." Id. See also City of New York v. Verizon New York Inc. , 331 F.Supp.2d 222, 226 (S.D.N.Y. 2004) (Swain, J.) ("unless the Complaint asserts an affirmative federal claim, the state law claims in the Complaint do not arise under federal law for the purposes of federal question jurisdiction"). Federal question jurisdiction therefore does not lie. In the alternative, plaintiff alleges that the parties are diverse, see Compl. ¶¶ 4-9, and that the amount in controversy exceeds $75,000. Id. ¶¶ 3 (citing 28 U.S.C. § 1332 ). Plaintiff's amount-in-controversy estimate, which is based upon the value of her Bancorp stock (see Pl. Obj. at 11-12) appears dubious. See n.4, supra. However, there is a "high bar" for overcoming the "rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." Scherer v. Equitable Life Assurance Soc'y of U.S. , 347 F.3d 394, 397 (2d Cir. 2003) (quoting Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc. , 166 F.3d 59, 63 (2d Cir. 1999) ). It would therefore be premature to dismiss this action for lack of subject-matter jurisdiction.

According to plaintiff, her obligation to arbitrate is measured by the arbitration clauses in the Brokerage Defendants' current client agreements, rather than those in place when she opened her accounts, because the current versions "prevail[ ] over previous versions." Pl. Obj. at 27 n. 48. According to plaintiff, the current version of the TDA agreement requires the customer to agree that "any controversy between [TDA] and me ... arising out of or relating to this Agreement, our relationship, any Services provided by [TDA], or the use of the Services, and whether arising before or after the date of this Agreement, shall be arbitrated and conducted under the provisions of the Code of Arbitration of the FINRA." Pl. Obj. at 27. Similarly, she reports, the current version of the Scottrade agreement states that "any controversy, dispute, claim, or grievance between us ... and you ... arising out of or relating to this Agreement, or any services provided by us ... shall be resolved by [FINRA] arbitration, in accordance with FINRA's Code of Arbitration." Id.

The language of the Brokerage Defendants' current arbitration provisions, as reported by plaintiff, is equally broad, covering "any controversy" arising out of or relating to a customer's "relationship" with TDA and "any controversy" with Scottrade "arising out of or relating to ... any services provided by us." Pl. Obj. at 27.

The FINRA Code is designed to be broadly applicable to "any dispute" between a customer and a member firm, whether it is submitted pursuant to an arbitration agreement or simply "requested by the customer," so long as the dispute arises "in connection with the business activities" of the firm. See FINRA Code, Rules 12101(a), 12200. The only claims excluded from its purview are class action claims and shareholder derivative suits. See id. , Rules 12204, 12205.

As noted above, see n. 10, supra , shareholder derivative suits are one of the few "types of claims" that are expressly excluded from arbitration under the FINRA Code.

These "success stories" are apparently what prompted plaintiff to try again. In her 2014 Statement of Claim against Scottrade, plaintiff counted "33 BCIT cases" resolved through FINRA arbitration, including three that resulted in awards for the claimants. Scottrade Mem. Ex. C, at ECF page 5; see also id. at ECF page 11-17 (attaching copies of the three favorable awards). Plaintiff did not mention that two of those "33 BCIT cases" were hers, both of which she lost.

TDA did not contest the monetary portion of the award. By the time the case got to the district court, TDA had complied with the arbitrator's direction and paid the $1,610.98 to the claimant. 2016 WL 5660399, at *3.

Given FINRA's finality rule, it seems unlikely that plaintiff will succeed if she attempts, yet again, to pursue the Brokerage Defendants in FINRA arbitration for relief arising out of her demand to re-register her Bancorp shares. But this is a question that "must be determined by the arbitrator,"Belco , 88 F.3d at 131, if and when plaintiff returns to FINRA.

In Katz v. Cellco P'ship , 794 F.3d 341, 347 (2d Cir. 2015), the Court of Appeals held that "the text, structure, and underlying policy of the FAA mandate a stay of proceedings," as opposed to a dismissal without prejudice, "when all of the claims in an action have been referred to arbitration and a stay requested." Since Katz , most of the district courts in our Circuit have hesitated to dismiss arbitrable claims, even where neither side has expressly requested a stay. See, e.g. , Merrick v. UnitedHealth Grp. Inc. , 127 F. Supp. 3d 138, 154 (S.D.N.Y. 2015) (finding that even where no party requested a stay, Katz mandated a stay in lieu of dismissal); China Media Express Holdings, Inc. by Barth v. Nexus Exec. Risks, Ltd. , 182 F.Supp.3d 42, 53 (S.D.N.Y. 2016) (staying plaintiff's claims pending arbitration "[p]ursuant to the Second Circuit's decision in Katz " ); Abreu v. Fairway Market LLC , 2018 WL 3579107, at *3 (S.D.N.Y. July 24, 2018) ("Neither party has yet requested a stay, but the Court will delay dismissal of this case for ten (10) days to give the parties the opportunity to make such a request if either so chooses.").

All parties appear to agree that New York law applies to plaintiff's accounting and trespass claims. See Pl. Obj. at 14-21. See also Compl. ¶¶ 7-9 (DTC Defendants were all formed under the laws of New York and headquartered in New York City).

The case at bar illustrates this point. Plaintiff does not and cannot allege that the DTC Defendants can even identify the retail customers who hold securities entitlements as against the Participants - much less evaluate their claims of "true ownership." See Pl. Obj. at 19 (arguing that DTC knows how many shares it is holding on behalf of TDA and Scottrade, but "[i]t is TD Ameritrade's books that show Harris owns 900,000 shares of Bancorp at the DTC, and Scottrade's books which show Harris owns 1,520,000 shares ..."). It is thus difficult to understand what plaintiff would learn from an "accounting" by DTC beyond that which she already knows.

Plaintiff cannot, of course, "plead around" facts that she has already conceded by omitting them from an amended complaint, Abdul-Rahman , 2012 WL 1077762, at *3, or by replacing them with different and inconsistent facts. See Rivera v. Doe , 2018 WL 1449538, at *5 (S.D.N.Y. Feb. 26, 2018) (Moses, M.J.) ("Nor is the court obligated to accept fresh factual assertions that contradict allegations previously made by the same plaintiff."); report and recommendation adopted , 2018 WL 1441386 (S.D.N.Y. Mar. 22, 2018).

In re Jetblue recited the "physical interference" requirement but did not dismiss the trespass claim on that basis. Instead, Judge Amon reasoned that defendants' conduct did not cause any harm to the "quality" or "value" of the chattel itself; that is, to the customer information that Jetblue allegedly divulged without plaintiffs' permission. 379 F. Supp. 2d at 327 (quoting Register.com , 356 F.3d at 404 ) ("A trespass to a chattel may be committed by intentionally ... using or intermeddling with a chattel in the possession of another, where the chattel is impaired as to its condition, quality, or value.").